UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

James Chavira,

      Plaintiff,

v.

Crown Cork & Seal USA, Inc.,

      Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 13-1734

_____

      Joni M. Thome, Baillon Thome Jozwiak & Wanta LLP, Counsel for Plaintiff.

      Cynthia A. Bremer and Kelly A. Mottiff, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Counsel for Defendant.

_____

## I.    Factual Background

      Defendant Crown Cork & Seal USA, Inc. ("Crown") is in the business of brand-building packaging, and is a leader in metal packaging technology. Crown operates a plant in Faribault, Minnesota, which employs 160 hourly and 28 salaried employees. The hourly employees are represented by the Sheet Metal Workers International Association, Local No. 480 ("Union").

      Plaintiff began working for Crown in its Faribault plant in 1989. During

his employment, he held many positions, including body feeder, production worker, maintainer's assistant and janitor.

Crown's workforce is divided into twelve classifications, each with its own pay rate. (Moffitt Decl. Ex. B (Plaintiff's Dep. Ex. 24 (CBA at 23)).) All of the job classifications, except job class 1, are required to work mandatory overtime. (Id. Ex. A (Schroeder Dep. at 35).) All of the positions Plaintiff held as an employee at Crown required mandatory overtime, with the exception of the janitor position, which was in job class 1. (Id.) The applicable CBA provides the rules concerning overtime work. (Id. Ex. B (Plaintiff Dep. Ex. 24).) These rules provide that overtime work will be rotated within the department, classification and shift, and will, on occasion, be mandatory. (Id. at Sections 8.4 and 8.5.)

Plaintiff has a long history of medical conditions, including diabetes and heart problems. He had an angioplasty in 1992 and a quadruple bypass in 2002. He suffered two heart attacks, cerebrovascular disease with TIAs, hypertension, hyperlipidemia, diabetic neuropathy and nephropathy and status post-splenectomy after he was in a car accident. (Id. Ex. B (Plaintiff's Dep. Ex. 9).)

Plaintiff testified that he stopped working overtime in 1996 due to his medical conditions related to diabetes. (Id. Ex B (Plaintiff Dep. at 32).) On

September 9, 2002, Plaintiff's physician placed him on the following work restrictions: no mandatory overtime, eight hours per shift. (Id., Ex. B (Plaintiff Dep. Ex. 8).) In 2006, his physician noted that these restrictions should be considered long term/permanent. (Id.) His physician later reinforced the restrictions in a letter dated October 24, 2006, due to Plaintiff's chronic medical problems, including atherosclerotic coronary artery disease. (Id. (Plaintiff Dep. Ex. 9).)

Crown asserts that it was initially able to accommodate Plaintiff's medical restrictions, but in September 2008, numerous Crown employees began to seek medical restrictions, which affected Crown's ability to schedule shifts. (Id. Ex. A (Schroeder Dep. at 17-18, Ex. 1).) In addition, Crown was looking to reduce manning as business was slowing down. (Id. at 18.) As it worked through employee restrictions, Crown determined that three employees, including Plaintiff, had remaining restrictions it needed to address. (Id. at 20-21, Ex. 1).) Crown further determined that if the plant ran more than two lines during Plaintiff's shift, there would have been only three or four employees working in job class 8, such that an employee's overtime rotation would come up faster if Plaintiff could not work his overtime shift. (Id. at 31-32.) Certain of these

employees complained of the additional overtime, and one filed a written complaint.  (Id. at 21, 28-29; Schroeder Decl. Ex. B.)

As a result, Crown made the decision to change its policy regarding employees with restrictions.  (Id. (Schroeder Dep. at 34-35, Ex. 2).)  The policy change involved placing employees with restrictions into job classifications that would allow them to work within the confines of their restrictions, and would ensure that the placement of an employee with restrictions would not result in a violation of another employee's rights under the CBA.   (Id. Ex. 3.)  Crown informed the union of the policy change by letter dated November 30, 2009.  (Id. (Schroeder Dep. at 34-35, Ex. 2.)

> It has come to my attention that in order to allow certain employees the maximum ability to work with restrictions the seniority or CBA rights of other employees are being violated.  We will no longer proceed along those lines.  This involves overtime assignments, shift assignment, job assignments, layoff, etc.  We will be analyzing each situation and addressing those that need to be addressed.

(Id.)

On December 16, 2009, a memo was issued to all employees regarding the change in policy regarding work assignments for employees with restrictions.  (Id. Ex. 3.)

In an ongoing effort to work with employees and stay within the Labor Agreement we will place employees with work restrictions in job grades and classifications that will allow them to work within the confines of their restrictions. This will be done by seniority in coordination with the contractual agreement.

However, under no circumstances will the placement of the employee lead to a violation of the labor agreement affecting other employees. As an example, if an employee cannot work more than 40 hours in a week, they will not be scheduled to a job that could require them to work more than 40 hours in a week. The reasoning is that it would force other employees to work overtime which is not theirs contractually.

(Id.)

On January 4, 2010, pursuant to this policy change, Plaintiff was moved from job class 8, which involves mandatory overtime, to job class 1, which does not involve mandatory overtime. (Id. Ex. 4.) On the same date, and in response to this transfer, Plaintiff filed a grievance pursuant to the CBA, claiming his transfer to job class 1 violated his rights under the ADA. (Id.) Plaintiff also submitted a letter to Kim Schroeder requesting a reasonable accommodation. (Id. Ex. B (Plaintiff Dep. at 58, Ex. 14).) In response to Plaintiff's grievance, Crown took the position that keeping Plaintiff in job class 8 was an unreasonable accommodation because such accommodation violated the rights of other employees. (Id. Ex. A (Schroeder Dep. at 42).)

In response to Crown's change in policy and his transfer to job class 1, Plaintiff's physician altered his medical restrictions by allowing Plaintiff to work additional weekend shifts, so long as Plaintiff was not scheduled to work consecutive weekends and that no shift exceeded 8 hours. (Id. Ex. B (Plaintiff Dep. Ex. 12).) Crown determined these new restrictions were unworkable in job class 8 because overtime needs were not predictable, and would require a 12 hour shift or consecutive weekends. (Id. Ex. A (Schroeder Dep. at 47-48, 62-63).)

On February 9, 2010, Plaintiff filed a charge with the EEOC claiming that he was demoted due to his disability. (Id. Ex. B (Plaintiff Dep. Ex. 15).) He amended the charge on April 15, 2010, again asserting disability discrimination but also checking the box marked "age." (Id. (Plaintiff Dep. Ex. 16).)

On March 4, 2010, Crown and the union representative met with Plaintiff to discuss Plaintiff's requested accommodations. (Id. Ex. A (Schroeder Dep. at 42-43, 64-68; Schroeder Dep. Ex. 9).) During the interactive process, Plaintiff met with a union representative, Joe Adamek, and two Crown employees, Richard Backlund and Kim Schroeder. Plaintiff was asked a number of questions about his need for accommodation, and what he could and could not do. (Id.) When asked if he could work any overtime, Plaintiff responded that he could possibly

volunteer for some overtime, but that it was a day to day thing. (Id.) During this meeting, he stated that working the janitor position affected his foot health. (Id.) In fact, Plaintiff was on FMLA leave at that time due to an infection in his foot. (Id. (Schroeder Dep. Ex. 12).) Plaintiff claims that the janitor position required him to wear steel toed shoes, and required him to increase his walking on the concrete floors, which was causing damage to his feet. (Id. Ex. B (Plaintiff Dep. at 95).)

In a decision dated January 10, 2011, an arbitrator decided the issue of whether the transfer from job class 8 to job class 1 violated the Seniority provisions in Section 12 of the CBA. (Schroeder Decl. Ex. C.) The arbitrator denied the grievance, finding that "'the physical ability to perform the work' includes the physical ability to work mandatory overtime - including successive overtime days." (Id. at 22.) The arbitrator further found no binding past practice would require Crown to keep Plaintiff at a position in job class 8. (Id. at 23.)

In late July 2011, Plaintiff was required to take an extended medical leave due to his heart condition. (Id. Ex. B (Plaintiff Dep. at 136).) On July 28, 2011, Plaintiff had a defibrillator surgically implanted. (Id.) On August 26, 2011, Plaintiff's heart physician, Dr. Lin, notified Crown of potential issues with

Plaintiff's defibrillator in the work environment and that Medtronic would assess the safety of the device in the work environment. (Plaintiff Ex. 17.) In response to Dr. Lin's letter, Crown developed the steps necessary to coordinate Medtronic's site visit. (Plaintiff Ex. 18.) Pursuant to these steps, Crown determined that Plaintiff's surgeon would contact Medtronic to schedule the walk-through. (Id. at CROWN-C003883.) Crown also determined that Medtronic would need to sign a confidentiality agreement if it performed a plant inspection. (Id.)

Schroeder wrote to Plaintiff in October 2011 informing him to coordinate with his surgeon and Medtronic in order to schedule the required environmental testing for Plaintiff's ICD device. (Id. Ex. B (Plaintiff Dep. Ex. 46).) She further wrote: "Upon receiving your medical practitioners release to return to work, you will again be processed through our existing return to work policy." (Id.) Plaintiff tried to arrange the testing, but was not able to do so and asked Crown for assistance. (Id. Ex. B (Plaintiff Dep. at 175-80).) Crown asserts that Plaintiff was told repeatedly that it was his responsibility to set up the testing. (Id. Ex. A (Schroeder Dep. Ex. 32).)

Also in October 2011, Plaintiff notified Crown that he was having problems

with his foot, and that he could not work as a result. (Id. Ex. B (Plaintiff Dep. at 145, Ex. 31.) In his Statement of Claims for Disability Benefits, Plaintiff indicated that his return to work date was unknown. (Id. (Plaintiff Dep. Ex. 32).)

Schroeder checked in with Plaintiff on November 4, 2011 regarding the Medtronic visit and to get an update about his foot injury. (Plaintiff Ex. 18 at CROWN-C004070.) Plaintiff informed her that he sent the forms to Medtronic and his physician and was waiting to hear back from them. (Id.)

A month later, Medtronic faxed a "Standard Letter" to Crown to inform Crown that Medtronic did not conduct onsite surveys, but that problems with Plaintiff's defibrillator were unlikely to occur in the workplace and only in certain instances. (Plaintiff Ex. 19.)

Plaintiff went to the Crown plant on January 11, 2012 to find out what was going on with regard to the environmental survey. (Id. Ex. B (Plaintiff Dep. at 172-73.) On January 17, 2012, Plaintiff's heart physician, Dr. Dunlay, wrote to Plaintiff to inform him she had contacted Medtronic about environmental testing, and learned that Medtronic does not do onsite testing. (Plaintiff Ex. 20.) She further noted such testing was still required before he returned to work, and that if the testing would not interfere with his defibrillator, she saw "no reason from a

cardiovascular perspective you would not be able to return to work with the prior restrictions . . ."  (Id.)

In February 2012, Plaintiff continued to seek Crown's assistance in setting up the onsite survey by faxing to Crown the list of companies that could potentially conduct the onsite survey.  (Plaintiff Ex. 21.)  Despite claiming that he was confused as to who was supposed to set up the onsite survey, Plaintiff did admit that he was told by a union representative that it was his responsibility to find the company to do the testing.  (Id. Ex. B (Plaintiff Dep. at 140, 162).)  Ultimately, the testing was never arranged.

Plaintiff's foot doctor released him to return to work for four hour shifts starting June 3, 2012.  (Id. Ex. A (Schroeder Dep. at 101-02, Ex. 36).)  He was released to work a full eight hour shift on June 7, 2012.  (Id. Schroeder Dep. Ex. 37.)  Prior to returning to work, Crown requested that Plaintiff have an independent medical exam.  (Id. Ex. A (Schroeder Dep. at 111-14).)

On July 5, 2012, Plaintiff met with Joan Olson, Personnel Assistant at Crown, and told her he was having problems with his knee - that he was hospitalized with an infection and was required to receive antibiotic therapy twice a day at the hospital, at 8 a.m. and 8 p.m., for twenty-eight days.  He was

also using a walker and was in a lot of pain.  (Plaintiff Ex. 29.)

During the month of July 2012, attempts were made for Plaintiff to be seen by a corporate physician, his treating physician, and finally by an Occupational Medicine physician in Rochester.  (Plaintiff Ex. 30.)  In a series of emails between Crown personnel, it appears that an IME appointment was never conducted due to confusion as to who should see Plaintiff.  (Moffitt Decl. Ex. A (Schroeder Dep. Exs. 49-51).)  On July 26, 2012, Schroeder was directed to contact Plaintiff to let him know an upcoming appointment had been cancelled "due to him being under a doctor's care outside of Crown."  (Id. Schroeder Dep. Ex. 51.)  On that date, Plaintiff sent Joan Olson an email explaining that he was having trouble moving after his rehab appointment.  (Id. Schroeder Dep. Ex. 52.)

On July 28, 2012, Crown terminated Plaintiff's employment pursuant to Section 12.4.6 of the CBA, which provides: "An employee shall lose his seniority and will be automatically terminated if he . . . has not been actively employed for a period of twelve (12) consecutive months since the employee's last day worked."  (Id. Ex. A (Schroeder Dep. at 105-07); Ex. B (Plaintiff Dep. at 114, 119, Exs. 7, 24).)  Crown asserts that although it did not give Plaintiff written notice of this provision, it personnel representative, Joan Olson, repeatedly told Plaintiff

that if he did not return to work by the end of July, he would hit twelve months of no active duty and that he would be terminated.  (Olson Decl. ¶ 2.)  The record shows that Plaintiff was aware of this particular CBA provision, as he referred to it an earlier email.  (Id. Schroeder Dep. at 115, Ex. 39 (May 31, 2012 email to Kim Valleen at Northwest EMC, Inc. from Plaintiff to set up ICD testing ("Oh my last work date was on 7/28/2011 . . . . almost went back to work, then My Diabetes flared up with two foot Ulcers, and have been dealing with those since 10/2011, and getting to the wire.  If I don't find someone and get back to work by August 1, 2012 <I will be fired???")

On October 17, 2012, the EEOC issued its determination as to Plaintiff's February 2010 disability discrimination charge.[1]  The EEOC found "reasonable cause to believe that [Crown] discriminated against [Plaintiff] based on his disability; in that he was denied reasonable accommodation and was demoted in violation of the ADA."  (Id. Ex. B (Plaintiff Dep. Ex. 19).)

Plaintiff commenced this action by serving his complaint on Crown on June 5, 2013.  In his complaint, he asserts three causes of action under the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01 et seq.:

---

[1]The EEOC did not make any finding as to Plaintiff's claim of age discrimination.  (Id.)

disability discrimination; failure to accommodate and reprisal.

## II.     Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. Celotex, 477 U.S. at 323. In determining whether a fact issue exists, the Court "does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." Tjernagel v. Gates Corp., 533 F.3d 666 (8th Cir. 2008). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

## III.    Crown's Motion for Summary Judgment

### A.      Claim Barred Based on 32 Month Delay of EEOC Determination

Crown first argues it is entitled to summary judgment because of the 32

month delay between the filing of Plaintiff's charge alleging disability discrimination and the EEOC's determination. Crown argues that under the MHRA, a claimant must, within one year of the alleged discriminatory action, either file a lawsuit or file an administrative charge with the local agency or the MDHR. Minn. Stat. § 363A.28, subd. 3. If the claimant files a charge with the MDHR, the MDHR must make a probable cause determination within twelve months. Minn. Stat. § 363A.28, subd. 6(b). In State by Beaulieu v. RSJ, Inc., 552 N.W.2d 695, 703 (Minn. 1996) the Minnesota Supreme Court held "that probable cause determinations made 31 or more months after a charge is filed are *per se* prejudicial to the respondent and require dismissal of the complaint." The only exception to this rule is if the delay is caused by the employer. Id. at n.8. Here, there was a 32 month delay between the filing of the charge and the determination. Plaintiff has not alleged that the delay was caused by Crown, nor did Plaintiff request the EEOC to issue a Right to Sue Notice earlier in the process.

Plaintiff argues that State by Beaulieu does not apply in this case because the investigation was conducted by the EEOC pursuant to the work-share agreement in place between the EEOC and the MDHR. (Schroeder Decl. Ex. D.)

Because the investigation was deferred to the EEOC, the provisions of the MHRA

relating to the time for investigation do not apply. Plaintiff argues that

dismissing discrimination claims because they have been thoroughly

investigated to a probable cause determination by the EEOC would thwart the

purpose of the work-share agreement between the EEOC and the MDHR.

In support of its position, Crown cites to a decision of another court in this

District in which claims brought under the MHRA were dismissed because the

EEOC did not make a probable cause determination until four years after a

discrimination charge was filed. Powers-Potter v. Nash Finch Co., No. 14-cv-

0339 (PJS/SER), 2014 WL 2003063 at *2 (D. Minn. May 14, 2014). In that decision,

Judge Schiltz rejected the argument that State by Beaulieu did not apply where

the EEOC conducted the investigation rather than the MDHR.

> But [plaintiff] cites no authority in support of her argument, and her
> argument is at odds with the plain language of the statute. Section
> 363A.28, subd. 3 requires plaintiffs to either file a lawsuit or an
> administrative charge within one year of the alleged discriminatory
> practice. Because [plaintiff] did not file her lawsuit within one year of the
> alleged discriminatory practice, her lawsuit could be timely only because
> she filed a charge with the EEOC, which then cross-filed it with the
> Department. At that point, § 363A.28, subd. 6 required the Department to
> make a probable-cause determination within 12 months. There is no
> authority for the proposition that the Department's decision to defer
> investigation to the EEOC somehow relieves it of this statutory duty.

Id.

Another court in this District, however, did not adopt Judge Schiltz's reasoning, finding that State by Beaulieu only applies to a charge that is prosecuted by the MDHR, rather than a civil action filed by an individual plaintiff, reasoning that "[w]hile the MDHR had some control over its own failure to make a timely determination, plaintiff is not responsible for the MDHR's delay in this case." Acker v. Environmental Resources Mgmt., Inc., Civ. No. 14-2504, 2015 WL 868055, at *4 (D. Minn. Feb. 27, 2015) (Nelson, J.) (quoting Montgomery v. Indep. Sch. Dist. No. 709, 109 F. Supp. 2d 1081, 1101 (D. Minn. 2000)).  This Court is persuaded by the reasoning set forth in Acker and finds that State by Beaulieu has no application in this case, which is a civil action brought by an individual plaintiff rather than a charge prosecuted by the MDHR. Accordingly, the Court finds that State by Beaulieu is distinguishable and does not warrant dismissal of Plaintiff's MHRA claims of disability discrimination.

## B.     Disability Discrimination - Demotion

In Count I of the Amended Complaint, Plaintiff alleges that Crown engaged in unlawful employment practices in violation of the MHRA by demoting him to a position in job class 1 and by terminating his employment

because of his disabilities.

The elements of a prima facie case of disability discrimination are: 1) Plaintiff is disabled as defined by the ADA; 2) he is qualified to perform the essential functions of the job, with or without reasonable accommodation; and 3) he has suffered an adverse employment action due to his disability. See Hoover v. Norwest Private Mortg. Banking, 632 N.W.2d 534, 542 (Minn. 2001). "Claims arising under the MHRA are analyzed using the same standard applied to ADA claims." Phillip v. Ford Motor Co., 328 F.3d 1020, 1023 n. 3 (8th Cir. 2003).

There is no dispute that Plaintiff is disabled as defined under the MHRA.

### 1.    Essential Job Functions

The parties dispute whether Plaintiff was qualified to perform the essential functions of the position in job class 8, with or without a reasonable accommodation. At issue in this case is whether mandatory overtime was an essential function of Plaintiff's position in job class 8.

The essential functions are those considered the fundamental duties of the job. Rehrs v. Iams Co., 486 F.3d 353, 356 (8th Cir. 2007). "[T]he employer's judgment in this regard is considered 'highly probative.'" Duello v. Buchanan County Bd. of Supervisors, 628 F.3d 968, 972 (8th Cir. 2010) (quoting Kammueller

v. Loomis, Fargo & Co.,, 383 F.3d 779, 786 (8th Cir. 2003)).  The burden is on the

employer to show a particular job function is essential.  <u>Rehrs</u>, 486 F.3d at 356.

> Evidence of whether a particular function is essential includes, but is not
> limited to, (1) the employer's judgment as to which functions are essential;
> (2) written job descriptions prepared before advertising or interviewing
> applicants for the job; (3) the amount of time spent on the job performing
> the function; (4) the consequences of not requiring the incumbent to
> perform the function; (5) the terms of a collective bargaining agreement; (6)
> the work experience of past incumbents in the job; and (7) the current work
> experience of incumbents in similar jobs.

<u>Id.</u>

The record shows that overtime is both a contractual obligation under the

CBA and is implemented to satisfy Crown's customer needs.  (<u>Id.</u> at 24; Ex. B

(Plaintiff Dep. Ex. 24 (CBA).)  Article VIII of the CBA is entitled "Overtime" and

provides the basis for computing overtime pay, and further provides that

overtime will be rotated within the department, classification and shift.  (<u>Id.</u> CBA

at 8.1 and 8.4.)  The CBA further provides that overtime assignments, when less

than all employees within a shift and job classification are required, will be

rotated as uniformly as practical, and where an insufficient number of employees

are not obtained, "the overtime assignment shall be obligatory for the employee

whose turn it is to work, who can perform the available work, in the classification

and shift affected." (Id. 8.5.)  All job classes, except for job class 1, are required to work mandatory overtime.  (Id. Ex. A (Schroeder Dep. at 35).)

Plaintiff challenges whether mandatory overtime is an essential function of his position in job class 8.  First, Plaintiff asserts that Section 8.5 of the CBA provides that "an employee who would normally perform the overtime may decline it." (Id. Ex. B (Plaintiff Dep. Ex. 24 (CBA at CROWN-C000550).)  However, the very next sentence and the one relied on by Crown, reads:  "However, if a sufficient number of employees are not obtained, the overtime assignment shall become obligatory for the employee whose turn it is to work, who can perform the available work, in the classification and shift affected." (Id.)

Plaintiff further questions whether mandatory overtime is an essential function of the job given the fact that Crown accommodated his no overtime restriction from 1996 to 2010.  While Crown did accommodate Plaintiff's restrictions for a number of years, the record is undisputed that employees performing in job class 8, including Plaintiff, frequently worked overtime.

Plaintiff testified that prior to his medical restriction regarding overtime, he worked a lot of overtime.  (Moffitt Decl. Ex. B (Plaintiff Dep. at 32).)  He further testified that when he was working overtime, he would do so seven days

a week.  (Id. at 114.)  He further acknowledged that within the last five years,

employees working in job class 8 were working overtime.  (Id. at 115.)  In

addition, he acknowledged that a coworker, Bryan Caron, complained of having

to work Plaintiff's overtime and that he had actually talked to Caron about his

complaints.  (Id.)

Further, the fact that Plaintiff was accommodated prior to 2010 does not

create a genuine fact question as to whether overtime is an essential function of

the job.  At the time Crown made the determination it could no longer

accommodate his no overtime restriction, it is undisputed that another employee

had complained of having to work Plaintiff's overtime.  The record also shows

that by requiring other employees to work Plaintiff's overtime hours, Crown was

violating the rights of those coworkers pursuant to the overtime provisions set

forth in the CBA.

Finally, Crown presented undisputed evidence which shows that the

amount of mandatory overtime at the Faribault plant increased beginning in 2010

as a function of customer demand and that Crown had anticipated the increase

by hiring additional hourly employees. (Second Moffitt Decl. ¶ 2, Ex. M.)  Crown

also produced over 160 pages of documents regarding other employee's

overtime, which support its position that overtime is considered mandatory and that uniform rotation of overtime is addressed in the relevant CBA. (CROWN-C000932 through CROWN-C001093.)

Based on the above, the Court finds that mandatory overtime is an essential function of Plaintiff's position in job class 8.

### 2. Qualified to Perform Essential Functions

The record also shows that Plaintiff could not perform the mandatory overtime function of his position in job class 8, with or without accommodation. Although his physician altered his work restrictions in January 2010 to allow Plaintiff to work forced overtime every other weekend, he was still restricted to working eight hours per day. (Moffitt Decl. Ex. B (Plaintiff Dep. Ex. 12).) The mandatory overtime requirements included working twelve hours per day, and could possibly require an employee to perform overtime two consecutive weekends.

Because Plaintiff cannot demonstrate that he was qualified to perform the essential functions of the position in job class 8 with or without accommodation, his disability discrimination claim based on the transfer to job class 1 has no merit and Crown is entitled to summary judgment. See Tjernagel, 533 F.3d at

672-73 (recognizing that attendance and mandatory overtime can be an essential

functions of a job, court affirmed summary judgment in favor of employer where

plaintiff could not perform mandatory overtime and no reasonable

accommodation existed as all production positions required overtime); see also,

Johnson v. City of Blaine, 970 F. Supp. 2d 893, 911-12 (D. Minn. 2013) (Davis, C.J.)

(finding that attendance and working overtime were essential functions of

plaintiff's job); Davis v. Florida Power & Light Co., 205 F.3d 1301, 1305-06 (11th

Cir. 2000) (same).

### C.      Reasonable Accommodation

In Count II, Plaintiff alleges that Crown failed to provide him a reasonable

accommodation and failed to engage in an interactive process in violation of the

MHRA.  Plaintiff claims that transferring him to a position in job class 1 was not a

reasonable accommodation, as such transfer resulted in him receiving a lower

hourly wage and because the increased walking and steel-toe shoe requirement

of that position caused further injury to his feet.

The law is clear that an employer is not obligated to provide the

accommodation requested or preferred by the employee.  Cravens v. Blue Cross

& Blue Shield of Kansas City, 214 F.3d 1011, 1019 (8th Cir. 2000).  The employer

need only provide an accommodation that is reasonable.  <u>Id.</u>; <u>Kiel v. Select</u>

<u>Artificials, Inc.</u>, 169 F.3d 1131, 1137 (8th Cir. 1999).  A reasonable accommodation

can include job restructuring, part-time or modified work schedules,

reassignment to a vacant position, an appropriate adjustment or modification of

examinations or training or other similar accommodations.  Minn. Stat. § 363A.08,

subd. 6.  The law also provides that a reasonable accommodation in the form of a

job transfer that pays a lower wage does not necessarily render such transfer an

unreasonable accommodation.  <u>See</u> <u>Cravens</u>, 214 F.3d at 1019 (citing <u>Cassidy v</u>

<u>Detroit Edison Co.</u>, 138 F.3d 629, 634 (6th Cir. 1998) (finding that an employer

may reassign an employee to a lower grade and paid position if employee cannot

be accommodated in the current position and a comparable position is not

available)).

     An accommodation will not be deemed reasonable if it requires an

employer to violate contractual rules in order to accommodate another

employee's disability.  <u>See</u> <u>U.S. Airways, Inc. v. Barnett</u>, 535 U.S. 391 (2002)

(regarding seniority rules in CBA); <u>Benson v. Northwest Airlines, Inc.</u> 62 F.3d

1108, 1114 (8th Cir. 1995) (same); <u>Broadwater v. Minnesota Dept. of Human</u>

<u>Servs.</u>, 22 F. Supp. 3d 989 (D. Minn. 2014) (finding requested accommodation not

reasonable if it violated a legitimate, non-discriminatory policy); <u>Toronka v. Continental Airlines, Inc.</u>, 411 Fed. App'x. 719, 725 (5th Cir. 2011) (finding that employer is not required to create a new permanent job type to accommodate a disabled employee, despite fact that employer may have allowed employee to temporarily work at a particular position until they recovered from an injury).

Despite the fact that Crown was previously able to accommodate Plaintiff by excusing him from overtime shifts, the record demonstrates that beginning in September 2008, Crown was faced with a growing number of employees with restrictions, and as a result, the scheduling process had become constricted. (Moffitt Decl. Ex. A (Schroeder Dep. at 17-18, Ex. 1).) In addition, Crown was also faced with an increased need for mandatory overtime at the Faribault plant in 2010 due to customer demand. (Second Moffitt Decl. Ex. M.) Finally, Crown demonstrated that if it allowed Plaintiff to remain in job class 8, and excused him from overtime shifts, coworkers would have to cover those shifts in violation of the CBA.

Under the MHRA, an employer need not make an accommodation for a disabled employee that causes the employer undue hardship. Minn. Stat. § 363A.08, subd. 6. Factors to consider in the undue hardship analysis include:

(1) the overall size of the business or organization with respect to number of employees or members and the number and type of facilities;

(2) the type of the operation, including the composition and structure of the work force, and the number of employees at the location where the employment would occur;

(3) the nature and cost of the needed accommodation;

(4) the reasonable ability to finance the accommodation at each site of business; and

(5) documented good faith efforts to explore less restrictive or less expensive alternatives, including consultation with the disabled person or with knowledgeable disabled persons or organizations.

Minn. Stat. § 363A.08, subd. 6(b).

The record shows that the parties did engage in an ongoing interactive process with Plaintiff to in order to find a mutually agreeable accommodation. During this process, Plaintiff stated that he could possibly work overtime shifts, but that it was a day to day thing as to whether he would physically be able to extend his work day. The unpredictability of Plaintiff's ability to work overtime hours created concerns about manning shifts at the Faribault plant. In addition, at least one coworker had filed a written complaint about covering Plaintiff's overtime hours. Accordingly, it is undisputed that allowing Plaintiff his requested accommodation would force Crown to violate the CBA with respect to

the complaining coworker.  The Court thus finds that Plaintiff has failed to demonstrate genuine issues of fact preclude summary judgment as to his failure to accommodate claim.

### D.    Disability Discrimination Claim Based on Termination

Plaintiff further claims that he was terminated due to his disability. Assuming without deciding that Plaintiff has established a prima facie case, Crown asserts that Plaintiff's employment was terminated for the legitimate, non-discriminatory reason that Plaintiff was not actively employed for a period of twelve consecutive months since his last day of work.  Under such circumstances, the CBA provided "[a]n employee shall lose his seniority and will be automatically terminated. . . " (Moffitt Decl. Ex. B (Plaintiff Dep. Ex. 24 (CBA at Section 12.4.6).)  Plaintiff alleges Crown's reason for his termination has no basis in fact and is a pretext for discrimination.

The following facts are undisputed.  Plaintiff's last day of work was July 28, 2011.  In August 2011, Plaintiff's cardiac physician informed Crown that Plaintiff had recently undergone implantation of a single chamber ICD, and that "[d]ue to concerns that [Plaintiff] may experience inappropriate defibrillator shocks as a result of interference from devices in his work environment,

Medtronic will interrogate his device in his work setting to assess safety."
(Plaintiff Ex. 17.)

In October 2011, Plaintiff was unable to work because of foot ulcers.
(Moffitt Decl. Ex. B (Plaintiff Dep. at 145), Ex. 31.)  With regard to the foot ulcers,
Plaintiff was cleared to return to work on June 7, 2012.  (Id. Ex. A (Schroeder Dep.
Ex. 37.)  Plaintiff then suffered a septic knee at the end of June 2012 and was
hospitalized for two days.  (Id. Ex. B (Plaintiff Dep. Ex. 26).)  He reported to Joan
Olson that he had antibiotic therapy set up at the hospital for 28 days, twice a
day.  (Id.)  When Plaintiff met with Olson on July 5, 2012, she noted that he
walked very carefully with the use of a walker.  (Id.)  Plaintiff testified that he
could not work during the time he was being treated for his septic knee.  (Id. Ex.
B (Plaintiff Dep. at 90).)  Plaintiff further testified that after the treatment for his
knee was completed, he suffered another foot ulcer and has not been able to
return to work since that time.  (Id. at 125-36, 186-88.)  Finally, the CBA provided
that an employee would be terminated if he/she were not actively employed for a
period of twelve consecutive months.  (Id. Ex. B (Plaintiff Dep. Ex. 24).)

Plaintiff claims that Crown thwarted his attempts to return to work before
July 28, 2012 through its continued insistence that the environmental survey,

required by Plaintiff's physician in August 2011, be conducted and then placing the responsibility to coordinate such survey on Plaintiff. Plaintiff asserts his cardiac physician cleared him to return to work on August 26, 2011, and the treating physician for his foot ulcers cleared him to return to work on June 7, 2012. Plaintiff thus argues that he could have worked some days in June 2012, and would not have been subject to termination under the CBA as of July 28, 2012. The record shows, however, that Plaintiff had not received a clearance to return to work from his cardiac physician, and that he did not arrange for the environmental testing, even though he was aware that the burden was on him to make such arrangements.

Plaintiff cites to the August 26, 2011 letter from Dr. Lin to support the assertion that he was cleared to return to work. (Plaintiff Ex. 17.) There is no language in that letter, however, releasing Plaintiff to return to work. Instead, the purpose of the letter was to inform Crown that Medtronic would interrogate Plaintiff's defibrillator in his work setting to assess safety. (Id.) Further, the record shows that as of January 2012, Plaintiff's treating cardiac physician continued to require that a company conduct the onsite environmental testing regarding his ICD before he could return to work. (Plaintiff Ex. 20.)

I am hopeful that this [testing] will allow you to return to work. From a heart failure perspective, beyond this testing that needs to be performed to ensure that you are safe with regard to your device, I see no reason from a cardiovascular perspective you would not be able to return to your work with the prior restrictions you had told me you had because of chronic medical problems such as diabetes.

(Id.)

Plaintiff further claims that Crown's asserted basis for his termination has no basis in fact because Crown did not assist him in his efforts to return to work despite his repeated pleas for help. Again, the record does not support Plaintiff's claim. Rather, the record shows that Crown was amenable to Medtronic or another company entering its facility and developed a number of steps to assist Plaintiff and his physicians with arranging the necessary testing. (See e.g. Plaintiff Ex. 18.) Although Crown told Plaintiff it was his responsibility to arrange the testing, Plaintiff can point to no evidence to show that Crown interfered with his attempts to do so.

Based on the undisputed evidence, Plaintiff has not demonstrated that Crown's articulated basis for his termination was a pretext for discrimination. See Woodyard v. Hoover Group, Inc., 985 F.2d 421, 425 (8th Cir. 1993) (finding employer "has articulated a legitimate, nondiscriminatory reason for [plaintiff's]

ultimate discharge, the application of the terms of the collective bargaining agreement that provide for the discharge of an employee after a year of medical leave of absence if the employee does not return to work.")

E.     Reprisal

To establish a prima facie case of retaliation, Plaintiff must show: he engaged in statutorily protected conduct; a reasonable person would have perceived the alleged retaliatory action to be materially adverse; and a causal connection exists between participation in the protected activity and the adverse employment action.  Sutherland v. Mo. Dep't of Corr., 580 F.3d 748, 752 (8th Cir. 2009).  If Plaintiff establishes a prima facie case of retaliation, the burden then shifts to Crown to produce a legitimate, non-retaliatory reason for its employment actions.  If Crown meets its burden, then Plaintiff must prove that Crown's reasons are a pretext for discrimination.  Clegg v. Arkansas Dep't of Corr., 496 F.3d 922, 928 (8th Cir. 2007) (noting that the McDonnell Douglas framework was to be used to analyze the plaintiff's retaliation claim).  To prove pretext, Plaintiff must both discredit Crown's asserted reasons for its employment actions and show the circumstances permit drawing a reasonable inference that the real reason for the employment decisions was retaliation.

Gilbert v. Des Moines Area Comm. Coll., 495 F.3d 906, 918 (8th Cir. 2007).

Plaintiff asserts that he engaged in protected activity by requesting an accommodation for his medical restrictions and by filing a charge with the EEOC in February 2010 and that he was demoted as a result.

The Court finds that for the same reasons Plaintiff's disability and failure to accommodate claims fail, Plaintiff's reprisal claim must also fail. Prior to his transfer to job class 1, Plaintiff's medical restriction as to overtime had been accommodated for over fourteen years. Crown articulated non-discriminatory reasons for the transfer, and Plaintiff cannot demonstrate the basis for the transfer is a pretext for discrimination.

**IT IS HEREBY ORDERED** that Defendant Crown Cork & Seal USA, Inc.'s Motion for Summary Judgment [Doc. No. 22] is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Date: August 18, 2015

s/ Michael J. Davis
Michael J. Davis
United States District Court